Hilgers Graben PLLC
Michael Merriman, California Bar No. 234993
mmerriman@hilgersgraben.com
Luke I. Landers, California Bar No. 315475
llanders@hilgersgraben.com
655 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 369-6232
Attorney for PLAINTIFF GS LABS, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

GS LABS, LLC,

    Plaintiff,

    v.

AETNA, INC., AETNA HEALTH, INC.,
AETNA HEALTH MANAGEMENT,
LLC, AETNA LIFE INSURANCE CO.,
AETNA HEALTH AND LIFE
INSURANCE CO., AETNA HEALTH OF
CALIFORNIA, INC., ADOBE, INC.,
DOCUSIGN, INC., SALESFORCE, INC.,
TRINET GROUP, INC., TRINET HR II
HOLDINGS, INC., and TRINET HR III,
INC.,

    Defendants.

Case No.  4:25-cv-08525

**COMPLAINT; AND
DEMAND FOR JURY TRIAL**

Plaintiff GS Labs, LLC ("GSL") brings this action against Defendants Aetna, Inc., Aetna

Health, Inc., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and

Life Insurance Company, and Aetna Health of California, Inc. (together, "Aetna"), and Adobe, Inc.,

Docusign, Inc., Salesforce, Inc., Trinet, Inc., Trinet HR II Holdings, Inc., and Trinet HR III, Inc.

(together, "Aetna ASO Plans") (all collectively, "Defendants").  Plaintiff demands a trial by jury

1

on all counts for which a right to trial by jury is allowed and, in support of this Complaint, alleges as follows:

## NATURE OF THE ACTION

1.     At its core, this case is simple. Aetna promised consumers and GSL that it would comply with federal law and pay providers' publicized cash price for COVID-19 diagnostic testing ("Covid Testing"). GSL relied on Aetna's promises and provided Covid Testing services for members of health plans either insured or administered by Aetna (the "Aetna Members"), including hundreds of California residents, and billed such health plans either insured or administered by Aetna (the "Aetna Health Plans") for these services. While Aetna signaled that it would follow its promises by reimbursing GSL the full amount for *some* Covid Testing services, Aetna underpaid, in many instances refused to pay, and in some cases even clawed back Covid Testing payments from GSL.

2.     Aetna accomplished this fraudulent undertaking through various schemes and entities, including the Aetna ASO Plans, in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"), and through false, deceptive, and unlawful conduct in violation of California law.

3.     In total, Aetna has refused to reimburse GSL for more than $53 million in Covid Testing services. In thousands of instances, Aetna has unilaterally discounted GSL's claims, and its self-awarded discounts comprise approximately $36.9 million of the unpaid balance. In thousands of other cases, for claims totaling more than $16.2 million, Aetna has simply not paid.

4.     Through this lawsuit, GSL seeks to: (i) hold Aetna accountable for the fraudulent and unlawful practices in which it engaged during the public health emergency; (ii) remedy the damage caused to GSL by Aetna by and through the various and related schemes Aetna used to circumvent its obligations under federal law; and (iii) act as a safeguard against unlawful practices by Aetna and other health insurance carriers and third-party claims administrators against providers and the public in the event of future pandemics and public health emergencies.

## PARTIES

5.     Plaintiff GSL is a limited liability company formed under the laws of Nebraska.

6.      Defendant Aetna, Inc. is a Pennsylvania corporation with its principal place of business in Connecticut. Aetna, Inc., may be served with process by serving its registered agent at C T Corporation System, 600 N 2nd St #401, Harrisburg, PA 17101.

7.      Defendant Aetna Health, Inc. is a Texas corporation. Aetna Health, Inc. may be served with process by serving its registered agent at CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

8.      Defendant Aetna Health Management, LLC, is a limited liability company formed under the laws of Delaware. Aetna Health Management, LLC may be served with process by serving its registered agent at C T Corporation System, 330 N Brand Blvd, Suite 700, Glendale, CA 91203.

9.      Defendant Aetna Life Insurance Company is a Connecticut corporation with its principal place of business in Connecticut. Aetna Life Insurance Company may be served with process by serving its registered agent at C T Corporation System, 330 N Brand Blvd, Glendale, CA 91203.

10.     Defendant Aetna Health and Life Insurance Company is a Connecticut corporation with its principal place of business in Connecticut. Aetna Health and Life Insurance Company may be served with process by serving its registered agent at C T Corporation System, 330 N Brand Blvd, Glendale, CA 91203.

11.     Defendant Aetna Health of California, Inc. is a California corporation with its principal place of business in California. Aetna Health of California, Inc. may be served with process by serving its registered agent at C T Corporation System, 330 N Brand Blvd, Glendale, CA 91203.

12.     Aetna, Inc., Aetna Health, Inc., Aetna Health Management, LLC, Aetna Life Insurance Company, Aetna Health and Life Insurance Company, and Aetna Health of California, Inc. are affiliates of one another who work together to ensure that all work to be performed or services to be provided under any insurance contracts with individuals or employers and/or administrative service agreements with self-funded health plan fiduciaries and their self-funded health plans are fulfilled for tens, if not hundreds, of thousands of residents of the State of California

who are Aetna Members of Aetna Health Plans. The following excerpt from an Aetna master service agreement offers a sketch of how these affiliated companies work together to fulfill Aetna's contractual obligations:

> **Subcontractors**
> The work to be performed by Aetna under the Services Agreement may, at Aetna's discretion, be performed directly by us or wholly or in any part through a subsidiary, an affiliate, or under a contract with an organization of our choosing. Aetna will remain liable for Services under the Services Agreement.

13. Defendant Adobe, Inc. (d/b/a Adobe Systems, Inc.) is a Delaware corporation with its principal place of business in San Jose, California. Adobe, Inc., may be served with process by serving its registered agent, Karen Robinson, at 345 Park Ave, San Jose, CA, 95110.

14. Defendant Docusign, Inc., is a Delaware corporation with its principal place of business in San Francisco, California. Docusign, Inc. may be served with process by serving its registered agent at United Agent Group Inc., 7801 Folsom Boulevard #202, Sacramento, CA 95826.

15. Defendant Salesforce, Inc., is a Delaware corporation with its principal place of business in San Francisco, California. Salesforce, Inc. may be served with process by serving its registered agent at C T Corporation, 330 N Brand Blvd., Glendale, CA 91203.

16. Defendant Trinet Group, Inc. is a Delaware corporation with its principal place of business in Dublin, California. Trinet Group, Inc. may be served with process by serving its registered agent at CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

17. Defendant Trinet HR II Holdings, Inc. is a Delaware corporation with its principal place of business in Dublin, California. Trinet HR II Holdings, Inc. may be served with process by serving its registered agent at CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

18. Defendant Trinet HR III, Inc. is a California corporation with its principal place of business in Dublin, California. Trinet HR III, Inc. may be served with process by serving its registered agent at CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

19.     These Aetna ASO Plans are each a fiduciary of its self-funded health plan, and they contract with Aetna so that Aetna will serve in the trusted role of third-party claims administrator.

### JURISDICTION AND VENUE

20.     This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331, as GSL asserts federal RICO claims against Aetna.

21.     The Court has supplemental jurisdiction over GSL's state law claims against Aetna under 28 U.S.C. § 1367(a) because these claims are so related to GSL's federal claims that the state law claims form a part of the same case or controversy under Article III of the United States Constitution.

22.     The Court has general personal jurisdiction over the Aetna ASO Plans because they each have their principal place of business in California and are thus California residents.

23.     This Court has general personal jurisdiction over Aetna because it is licensed to conduct the business of insurance and third-party claims administration services in California and it actually conducts such business throughout California.

24.     This Court has specific personal jurisdiction over all Defendants because a substantial portion of GSL's claims arise from Defendants' fraudulent and improper claims processing activities conducted in this state. Hundreds of Aetna Members who reside in California received Covid Testing services from GSL, and Aetna received and processed these claims for reimbursement for the California residents. Aetna also communicated with the Aetna ASO Plans about GSL's claims in California, Aetna submitted claims for payment to the Aetna ASO Plans in California, and Defendants decided in California not to pay or underpaid GSL for its services.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District and under 28 U.S.C. § 1391(b)(1) and (c)(2) because the Aetna ASO Plans reside in this District.

26.     Divisional Assignment. Assignment to the San Francisco or Oakland Division is proper under Civil L.R. 3-2(c) because Defendants Docusign, Inc. and Salesforce, Inc. are headquartered in San Francisco, Defendants Trinet Group, Inc., Trinet HR II Holdings, Inc., and

Trinet HR III, Inc. are headquartered in Alameda County, and a substantial part of the events or omissions that give rise to the claims occurred in these counties.

## FACTUAL ALLEGATIONS

### I.    Background to the FFCRA and CARES Act.

27.     Pursuant to Section 319 of the Public Health Service Act, on January 31, 2020, the Secretary of Health and Human Services ("HHS") issued a determination that a Public Health Emergency existed as of January 27, 2020, due to confirmed cases of COVID-19 being identified in this country. The COVID-19 Public Health Emergency expired on May 11, 2023.

28.     On March 13, 2020, the President issued Proclamation 9994 declaring a National Emergency concerning the COVID-19 outbreak with a determination that a national emergency exists nationwide, pursuant to Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act.

29.     To facilitate the nation's response to the COVID-19 pandemic, Congress passed the Families First Coronavirus Response Act ("FFCRA") and the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Among other things, these statutes require group health plans and health insurance issuers offering group or individual health insurance coverage to: (i) provide benefits for certain items and services related to diagnostic testing for the detection or diagnosis of COVID-19 without the imposition of any cost-sharing requirements (i.e. deductibles, copayments, and coinsurance) or prior authorization or other medical management requirements; and (ii) to reimburse any provider for Covid Testing at the negotiated rate or, if the plan or issuer does not have a negotiated rate with the provider (e.g., GSL), the cash price for such service listed by the provider on its public website in accordance with 45 CFR § 182.40.

30.     To clarify to issuers and health plans their legal expectations when processing a claim for Covid Testing in accordance with the FFCRA and the CARES Act, the Department of Labor ("DOL"), the Department of Health and Human Services ("HHS"), and the Department of the Treasury (the "Treasury") (collectively, the "Departments") jointly prepared and issued a series of Frequently Asked Questions ("FAQs") to address stakeholder questions or concerns pertaining to the proper adjudication of Covid Testing claims. One such FAQ reads as follows:

**The Departments FAQ, Part 42, Q7:** *Are plans and issuers required to provide coverage for items and services that are furnished by providers that have not agreed to accept a negotiated rate as payment in full (i.e., out-of-network providers)?*
Yes. Section 3202(a) of the CARES Act provides that a plan or issuer providing coverage of items and services described in section 6001(a) of the FFCRA shall reimburse the provider of the diagnostic testing as follows: . . .
If the plan or issuer does not have a negotiated rate with such provider, the plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or the plan or issuer may negotiate a rate with the provider for less than such cash price. . . .

## II.     GSL develops a distinct, high-quality COVID testing operation.

31.     GSL was formed in January 2020 as a clinical lab in Omaha, Nebraska.

32.     In response to the COVID-19 public health emergency in early 2020, GSL shifted its business model to focus on providing Covid Testing to communities in need, quickly investing in and opening over fifty Covid Testing sites across the country.

33.     As a new entrant to the nascent Covid Testing market, GSL had to make substantial investments to quickly develop infrastructure and a team for delivering its Covid Testing services entirely from the ground up in response to the fast-spreading pandemic.

34.     Given the unusually high infection rate of COVID-19 and the need for rapid testing to prevent community spread—and in contrast to other testing providers—GSL's founders focused on developing a scalable, capital-intensive, high-quality testing operation that would attract patients by maximizing appointment availability while providing safe, seamless, secure, and accessible drive-through testing administration, and where possible, delivering same-day test results.

35.     Additionally, to maximize testing capacity, GSL secured staffing to operate its sites up to seven days per week, twelve hours per day.

36.     The distinctly high-quality Covid Testing operation GSL developed required the investment of significant capital. GSL invested substantial resources in developing a secure and proprietary intake and results distribution software technology platform, procuring leases to operate numerous testing locations, purchasing high-grade supplies and equipment, and more.

37.     GSL also assembled its own in-house support teams, including staffing and billing personnel, and committed to employing highly credentialed test administrators—predominantly

registered nurses ("RNs")—to be present on-site and available to answer patient questions. GSL paid premium wages to recruit, train, and retain highly skilled testing providers to exceed industry standards of care.

38.     Maintaining these outlays required GSL to secure consistent cash flows and charge prices that reflect the true cost of its higher-quality services.

39.     As a result of this extensive planning and substantial investment, GSL established the capacity to administer tests to up to 1,000 patients per day at each of its testing sites.

40.     GSL's premium system allowed patients to book appointments a mere 15 minutes ahead of time and to receive test results in as little as 20 minutes, with no compromise to patient safety, security, or test accuracy.

41.     GSL's planning and investments enabled it to test more patients and provide results more quickly than incumbent testing providers like retail pharmacies.

**III.     Aetna's multiple RICO violations**

**A.  Overview**

42.     Although Aetna was required to comply with the FFCRA, the CARES Act, the ACA, and with the terms of each Aetna Health Plan, Aetna engaged in fraudulent and other unlawful actions to conduct and participate in the affairs of the Aetna Health Plans, including the Aetna ASO Plans. In doing so, Aetna has engaged in multiple violations of RICO, 18 U.S.C. §§ 1961–1968.

43.     Each of the Aetna ASO Plans is an enterprise within the meaning of 18 U.S.C. § 1961(4), in that each has an independent legal existence.

44.     Aetna has conducted or participated in the affairs of these enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5) and conspired with others to do so. In doing so, Aetna has violated 18 U.S.C. §§ 1962(c) and 1962(d).

45.     Moreover, Aetna has invested the proceeds of its racketeering activity into one or more enterprises and conspired with others to do so. In doing so, Aetna has violated 18 U.S.C. §§ 1962(a) and 1962(d).

46.    This pattern of racketeering activity involves Aetna's multiple and repeated use of the mails and wires in furtherance of at least six distinct but interrelated schemes to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

47.    The pattern of racketeering activity also involves Aetna's multiple and repeated acts of embezzlement and/or conversion of the Aetna ASO Plans' trust assets in violation of 18 U.S.C. § 664.

48.    GSL has been injured in its business and property through Aetna's multiple RICO violations and thus has standing to bring this action under RICO's civil enforcement provision, 18 U.S.C. § 1964(c).

**B. The RICO Enterprises**

49.    At all relevant times, each of the subject Aetna ASO Plans has been an "enterprise" within the meaning of 18 U.S.C. § 1961(4), as each is an independent legal entity distinct from Aetna, and each Aetna ASO Plan subject to ERISA is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1).

50.    At all relevant times, the Aetna ASO Plans have been and continue to be engaged in activities affecting interstate commerce, including, but not limited to, providing health insurance coverage through employer self-funded health benefit plans to employee-members (and dependent-members) across state lines.

51.    The Aetna ASO Plans exist for the legitimate purpose of providing each of their respective plan members with health insurance coverage for medically necessary treatment provided by INN and OON providers under the terms of the Aetna ASO Plans. However, Aetna conspired to conduct or participate in the affairs of the Aetna ASO Plans through a separate and distinct "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

**C. Aetna's Pattern of Racketeering Activity**

52.    Since at least 2020 and continuing through the course of the COVID-19 public health emergency and to the present, Aetna has conducted and participated in the affairs of the Aetna ASO Plans, through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and conspired with others to do so.

53.     The pattern of racketeering activity includes multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and embezzlement and/or conversion for Aetna's own use of the Aetna ASO Plans' trust assets in violation of 18 U.S.C. § 664.

54.     Aetna (a) used the mails and wires (b) in the foreseeable furtherance of (c) a scheme or artifice to defraud (d) involving material deceptions (e) with the intent to deprive GSL and other similarly situated OON providers of property.

55.     Aetna's schemes to defraud, predicate acts of mail and wire fraud, and predicate acts of embezzling or converting the Aetna ASO Plans' trust assets in furtherance of these schemes to defraud are described in detail below. Aetna's racketeering acts together have the following features.

**1.  Relatedness**

56.     Aetna's acts of racketeering are not isolated events. Rather, all are related to each other in that they have similar purposes, results, participants, victims, methods of commission, and other distinguishing characteristics. All of the acts were done for the benefit of Aetna and in furtherance of Aetna's agenda.

57.     Aetna's predicate acts of racketeering were and continue to be directed at the same overarching goals of harming GSL financially by deceiving GSL, Aetna Members, and the Aetna ASO Plans.

58.     Aetna has specifically targeted OON providers, including GSL, in pursuit of its profiteering. Aetna's schemes to defraud are aimed at depriving GSL of monies it is owed under applicable law and the terms of the Aetna Health Plans, including the Aetna ASO Plans, amended by applicable law. GSL is the intended and actual victim of each separate act of racketeering described herein.

59.     Aetna has participated in, authorized, and/or ratified the specific acts of mail and wire fraud and embezzlement and conversion alleged herein. Aetna has issued false and misleading transmissions and statements over the mails and wires designed to mislead GSL, the Aetna Members, and the Aetna ASO Plans about their obligations to comply with and/or administer Aetna Health Plans in compliance with the FFCRA and the CARES Act in furtherance of Aetna's various

10

schemes. Aetna has also used the mails and wires to create the false impression that Aetna pays what it is legally obligated to pay OON providers for Covid Testing services on behalf of Aetna Members and the Aetna ASO Plans, to the significant financial determinant of GSL.

60.     Aetna and its officers and employees expressly designed and authorized the racketeering acts and participated actively in them.

**2.    Continuity**

61.     Aetna's related racketeering acts have extended from at least 2020 (and likely much earlier) and continued through the course of the COVID-19 health emergency and to the present.

62.     Upon information and belief, Aetna's schemes to defraud and acts of embezzlement and conversion of Aetna ASO Plan trust assets have generated millions of dollars in revenue for itself and the third-party Repricing Companies and the Overpayment Recovery Companies.

63.     The related predicate acts therefore involve a continued threat of long-term racketeering activity. There is no foreseeable end point to Aetna's acts of racketeering against GSL and other similarly situated OON providers.

64.     In addition, the predicate acts and offenses described herein are Aetna's regular way of doing business and thereby threaten long-term illegal conduct against the public at large.

**D.   Aetna Uses the Mails and Wires in Furtherance of Multiple Schemes to Defraud, in Violation of 18 U.S.C. §§ 1341 and 1343.**

65.     Through all of Aetna's interrelated schemes to defraud, Aetna deprives GSL of money and property, including money owed to GSL under the Aetna Health Plans (including the Aetna ASO Plans), and unnecessary time and administrative expense seeking to obtain payments to which GSL is already entitled under applicable law.

66.     Aetna, its officers, and agents have used the mails and wires to execute Aetna's schemes to defraud by transmitting material misrepresentations and omissions about its obligations under the FFCRA and the CARES Act to cover and reimburse GSL and other similarly situated OON providers of Covid Testing services, while simultaneously profiting from its intentional violations of these laws. The time, place, methods, modes, and nature of these misrepresentations are described more fully below.

67.     Aetna's false representations were material in that they were capable of influencing the decisions of those to whom the statements were directed in ways having an adverse financial impact on GSL. At all relevant times, such adverse financial impact was not only foreseeable but was and is the specifically intended result of Aetna's fraudulent schemes. Aetna intended and intends for the Aetna ASO Plans and the Aetna Members to act in reliance on Aetna's material misrepresentations and concealments by receiving Covid Testing from OON providers under the false understanding that Aetna would reimburse those providers at a cash price or negotiated rate in compliance with the CARES Act. Aetna intended and intends for GSL and other similarly situated OON providers to act in reliance on Aetna's material misrepresentations and concealments by providing Covid Testing services to Aetna Members under the false understanding that Aetna would reimburse those providers at a cash price or negotiated rate in compliance with the CARES Act.

68.     In fact, the Aetna ASO Plans, Aetna Members, and GSL and other OON providers relied on Aetna's material misrepresentations. This reliance was to GSL's detriment, precisely as Aetna intended. GSL has lost money and has been forced (and continues to be forced) to expend administrative resources seeking to obtain payments to which GSL is entitled—a direct and intended result of Aetna's schemes to defraud.

69.     Aetna acted with the specific intent to deceive and for the purpose of depriving GSL of property. Aetna specifically intended to cause GSL such injury.

70.     All acts of mail and wire fraud alleged herein were ordered by Aetna and performed by persons acting as agents on its behalf. In fact, Aetna's name is on the various HIPAA standard transactions to the Aetna ASO Plans and GSL, as well as the Explanations of Benefits, Explanations of Payments, Appeal Responses, Overpayment Notices, Internal Policies, and guidance and publications to providers, Aetna ASO Plans, and Aetna Members, that have been used in Aetna's furtherance of its schemes to defraud.

**1. Public Misinformation Campaign Scheme**

71.     Immediately upon the declaration of the COVID-19 public health emergency, Congress passed the FFCRA and the CARES Act, which incorporated and amended ERISA, the

ACA, and the terms of all private health plans subject to Section 6001 of the FFCRA. The FFCRA and CARES Act mandated the coverage and proper reimbursement of Covid Testing services to ensure that everyone and anyone in this country could gain access to Covid Testing when needed and would not need to pay for the testing from their own pockets.

72.     Aetna latched onto Congress' legislation and publicly campaigned and declared to INN and OON providers, its Aetna Members, its Aetna ASO Plans, and all other stakeholders that Aetna would comply with all requirements of these new emergency laws.

73.     Aetna publicized and/or made reference to the FFCRA and the CARES Act across many mediums (e.g. websites, FAQs, articles, bulletin board materials, guidance documents, etc.) and used its purported compliance with these laws to generate goodwill with the public. Aetna wished for the public and providers like GSL to believe that Aetna was working with government entities and healthcare providers to address key concerns amidst the COVID-19 pandemic.

74.     As one example, Aetna published the FAQ "Will Aetna cover the cost of COVID-19 testing for members?" on its website and affirmed:

> Yes. In addition, Aetna is waiving member cost-sharing for diagnostic testing related to COVID-19. The test can be done by any authorized testing facility. This member cost-sharing waiver applies to all Commercial, Medicare, and Medicaid lines of business. The policy aligns with the Families First and CARES legislation and regulations requiring all health plans to provide coverage of COVID-19 testing without cost share. The requirement also applies to self-insured plans. Per guidance from the Centers for Medicare & Medicaid Services (CMS), the Department of Labor and the Department of the Treasury, all Commercial, Medicaid and Medicare plans must cover COVID-19 serological (antibody) testing with no cost-sharing.

75.     Aetna also clarified in a separate FAQ that if an Aetna Health Plan:

> provides in and out of network coverage, then the cost-sharing waiver applies to testing performed or ordered by in-network or out-of-network providers. The policy aligns with the Families First and CARES Act legislation and regulations requiring all health plans to provide coverage of COVID-19 testing without cost share.

(emphasis added).

76.     In these public messages, Aetna purports to cover all Covid Testing services without imposing any cost-share obligations and to follow the CARES Act—which requires Aetna to pay OON providers their cash price or a negotiated rate. However, as detailed in the other interrelated schemes, Aetna's actions belie these representations. Aetna has underpaid or refused to pay GSL for over one hundred thousand claims amounting to over $53 million.

13

77.     On information and belief, Aetna likely assumed that by publicly proclaiming its dedication to compliance with applicable emergency laws that Aetna Members and Aetna ASO Plans would fail to notice the way in which their Covid Testing claims were actually adjudicated— adjudications which enabled Aetna to implement related schemes to embezzle and convert Aetna ASO Plan assets to itself.

78.     On information and belief, it is likely that Aetna prepared and disseminated materials to Aetna Members and Aetna ASO Plans purporting to comply with the FFCRA and the CARES Act, and discovery obtained for this scheme will reveal the lengths to which Aetna has gone to deceive Aetna Members and Aetna ASO Plans into thinking that each of their respective health plans was being administered lawfully.

79.     Aetna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

**2.  Contradictory Internal Policies**

80.     The messaging behind Aetna's Public Misinformation Campaign is clear: Proclaim compliance with the FFCRA, the CARES Act, and other controlling guidance to the public without qualification while simultaneously working to undermine and circumvent those same laws and requirements via contradictory policies.

81.     For example, Aetna stated publicly that it would cover Covid Testing pursuant to the CARES Act, which requires Aetna to reimburse GSL at either a negotiated rate or an amount that equals the cash price for such service listed by the provider on a public website. But Aetna's own pricing policy for providers stated that Aetna would only cover OON providers like GSL for Covid Testing according to the Medicare rate "based on rates announced by CMS."

82.     Upon information and belief, these CMS rates are much less than Aetna would pay its INN providers, and they result in a financial loss for every test GSL renders.

83.     This policy is a blatant contradiction of Aetna's public statements and the reimbursement requirements of Section 3202(a) of the CARES Act. It has harmed GSL by improperly paying GSL rates below its listed cash price, inflicting financial losses.

84.    Further, when Aetna did pay GSL for Covid Testing services, Aetna applied over two hundred different rates for a single type of antibody test. Further, Aetna reimbursed specimen collection, a $50 service, at 224 different prices. These conflicting internal policies betray Aetna's public representations and violate federal law.

85.    Of the claims Aetna paid, most were less than 25% of GSL's posted cash price—the price Aetna both publicly represented it would pay and which Aetna was legally obligated to pay under the CARES Act.

86.    On information and belief, it is likely that Aetna prepared and disseminated a significant amount of materials internally to its staff and other agents involved in any review of a Covid Testing claim, and discovery obtained on this scheme will reveal the lengths to which Aetna has gone to circulate materials designed to undermine Aetna's obligations under the FFCRA and the CARES Act.

87.    Aetna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

**3. Contradictory Adjustment Codes**

88.    This scheme involves Aetna's use of mails and wires to fraudulently apply a variety of adverse benefit determination adjustment and reason codes to either underpay or entirely deny GSL's Covid Testing claims.

89.    Aetna's use of these adjustment codes intentionally contradicts and undermines the Congressional mandates of the FFCRA and the CARES Act, which have amended the ERISA, the ACA, and the terms of Aetna Health Plans (including the Aetna ASO Plans) to require mandatory coverage of medically appropriate Covid Testing services and reimbursement to OON providers in an amount equal to their publicized cash prices or a negotiated rate agreed to between Aetna and the OON provider.

90.    When GSL performs Covid Testing services on Aetna Members, it bills the Covid Testing claim to Aetna for coverage and reimbursement. But despite the representations made to all stakeholders about compliance with the FFCRA, the CARES Act, and other applicable laws through the Public Misinformation Campaign Scheme, and despite the contradictory internal

policies of Aetna as detailed in above in the "Contradictory Internal Policies Scheme" section, the adjustment and reason codes Aetna uses for its initial claims adjudication conflict with Aetna's public statements feigning compliance with applicable law, conflict with Aetna's own internal coverage and reimbursement policies, and are not consistently applied despite the uniformity of the Covid Testing claims billed and the expected uniformity of results.

91.     As the following non-exhaustive examples show, the adjustment and reason codes Aetna has used in its initial adjudication of GSL's Covid Testing claims contradict and undermine the FFCRA and the CARES Act, along with Aetna's own public statements and/or Aetna's own internal policies.

- **CO-45, PR-45: "Charge exceeds your contracted/legislated fee arrangement."** Aetna's application of these codes to GSL's Covid Testing services directly conflicts both with the CARES Act's reimbursement requirements and Aetna's own internal policies that Covid Testing claims will be reimbursed at CMS rates. GSL is an OON provider for Aetna, so it is not subject to any contracted fee arrangements; therefore, Section 3202(a) of the CARES Act's reimbursement requirement is controlling, and it requires that Aetna reimbursement GSL at its publicized cash price.

- **PI-226: "Information requested from the Billing/Rendering Provider was not provided or not provided timely or was insufficient/incomplete."** Aetna's use of this code conflicts with the FFCRA and Aetna's own public statements because Section 6001 of the FFCRA prohibits the imposition of medical management requirements on a claim prior to the determination of whether a service should be covered and/or is medically necessary. Thus, the information GSL provided by sufficient under the laws Aetna promised to follow.

- **PI-242: "Services not provided by network/primary care providers."** While Aetna is correct that GSL is an OON laboratory and thus not an in-network or primary care provider, the CARES Act—which Aetna publicly promised to follow—requires Aetna to pay OON laboratories like GSL either the cash price or a negotiated rate for Covid Testing services. Therefore, Aetna cannot deny claims on the grounds that GSL is not in-network or a primary care provider.

92.     Aetna has discounted or denied GSL's claims by applying these reduction codes and many others. It's obvious, then, that Aetna adjudicates Covid Testing claims in a manner that not only disregards the laws to which each of the Covid Testing claims is subject, but Aetna also disregards the Covid Testing policies it has set and publicly advertised for itself.

93.     Aetna's lack of uniformity in processing GSL's claims is striking. For some Covid Tests, Aetna reimbursed GSL in full. But in other, identical Covid Tests administered the same day, Aetna unilaterally discounted the claims to varying degrees.

94.     Despite the uniformity of claims adjudication expected under the FFCRA, the CARES Act, and Aetna's own policies, Aetna instead issued dozens of inconsistent claims adjudications and reason codes to overwhelm GSL, making it nearly impossible for GSL to properly evaluate each Covid Test that Aetna refused to pay. Aetna's farcical internal administrative appeals process (detailed below) only multiplied GSL's burden.

95.     Not only were these codes provided to GSL through the mails and wires, but Aetna also provided these codes to Aetna Members and the Aetna ASO Plans—also through mails and wires—for every Covid Testing claim, in furtherance of this fraudulent scheme.

### 4. Repricing Reduction Scheme

96.     Through the Repricing Reduction Scheme, Aetna conspires with Repricing Companies to pay itself, from embezzled and/or converted Aetna ASO Plan trust assets, extra savings fees.

97.     Before explaining the details of this scheme, it is important to understand that Aetna, through its ASO Agreements, arranges for itself complete and unfettered access to each of the Aetna ASO Plans' trust assets.

98.     The following language appears in an Aetna ASO Agreement and confirms Aetna's unfettered access to Aetna ASO Plan trust assets:

> **BENEFIT FUNDING**
> Plan benefit payments and related charges of any amount payable under the Plan shall be made by check drawn by Aetna payable through the Bank or by electronic funds transfer or other reasonable transfer method. Customer [the Aetna ASO Plan], by execution of the Services Agreement, expressly authorizes Aetna to issue and accept such checks on behalf of Customer for the purpose of payment of Plan benefits and other related charges. Customer agrees to provide funds through its designated bank sufficient to satisfy all Plan benefits . . . and related charges upon notice from Aetna or the Bank of the amount of payments made by Aetna.

99.     The Aetna Repricing Reduction Scheme generally works as follows:

100.    A healthcare provider may enter an OON contract with a third-party Repricing Company, whereby the OON provider agrees to reduce its billed charges in accordance with a

specified contract rate or schedule. Under such a contract, the OON provider accepts reduced payments on its claims (including the patient's cost-share obligation) as payment in full. At the same time, the OON provider waives its right to balance bill the patient.

101. GSL has not entered any OON contracts with a third-party Repricing Company.

102. Aetna's ASO Agreements with the Aetna ASO Plans, which agreements are drafted by Aetna, allow Aetna to apply discounts to claims on behalf of the Aetna ASO Plans as determined through third-party Repricing Companies or Aetna's own negotiation of billed charges. In these instances, Aetna will apply discounted rates to the OON provider's billed charge, resulting in payments well below the amounts payable under the Aetna Health Plans, or in this case, mandated by Section 3202(a) of the CARES Act.

103. From this discount, Aetna then pays itself an "Access Fee," which, upon information and belief, is 50% of the "Aggregate Savings" (the difference between the OON provider's billed charges—or, in this case, the cash price—and the amount actually paid to the OON provider under Aetna's or the third-party Repricing Company's contract or negotiation).

104. Aetna's ASO agreements with Aetna ASO Plans requires that the Aetna ASO Plans pay Aetna these "Access Fees" directly from the Aetna ASO Plans' trust assets (to which Aetna has unfettered access).

105. Again, the "Access Fees" Aetna takes for itself are calculated as a percentage of the "Aggregate Savings" Aetna claims to deliver the Aetna ASO Plan. In other words, when Aetna unilaterally discounts a claim, it gets to take 50% of that discount from the ASO Plan for itself.

106. This scheme provides a financial incentive for Aetna to severely underpay GSL's Covid Testing claims so that it can simultaneously convert funds from its Aetna ASO Plans.

107. For example, if GSL issued a Covid Testing claim for $1,000 to an Aetna ASO Plan, and Aetna paid GSL only $200 on behalf of the Aetna ASO Plan, Aetna would also be able to convert $400 (50% of the $800 unilateral discount Aetna applied to GSL's claim) from the Aetna ASO Plan's assets to itself as the "Access Fee." Thus, in such a scenario, Aetna uses the Aetna ASO Plan's assets to pay itself *more* than the Aetna ASO Plan pays GSL for performing the test.

108. Take the following EOB from an Adobe, Inc. ASO Plan as a real-world example:

| Aetna Life Insurance Company | | | | | | | | | Network Status: **Out-of-Network** | |
|---|---|---|---|---|---|---|---|---|---|---|
| SERVICE DATES | PL | SERVICE CODE | NUM. SVCS | SUBMITTED CHARGES | ALLOWABLE AMOUNT | COPAY AMOUNT | NOT PAYABLE | SEE REMARKS | DEDUCTIBLE | CO INSURANCE | PATIENT RESP | PAYABLE AMOUNT |
| 07/01/22 | 11 | 87635 | 1.0 | 229.00 | | | 177.69 | 1 2 | | | | 51.31 |
| **TOTALS** | | | | 229.00 | | | 177.69 | | | | | 51.31 |

**ISSUED AMT:**   **$51.31**

**Remarks:**
1 - *The member's plan provides benefits for covered expenses at the reasonable charge for the service in the geographical area where it is provided. In certain circumstances, especially where the service is unusual or not often provided in the geographical area, the reasonable charge may be determined by considering other factors, including the prevailing charge in other areas. You are not part of our network and therefore we cannot prevent you from billing the member for any balance. But if you do, we reserve the right to challenge your bill.*

*Note: Some state laws prohibit you from balance billing a fully insured member. Confirm the member's plan funding, then refer to the state's regulation. [W39]*

2 - *Because of the COVID-19 pandemic, we suspended some of our policies and rules. [HHG]*

**For Questions Regarding This Claim**
P.O. BOX 981106 EL PASO, TX  79998-1106
**CALL (888) 632-3862** FOR ASSISTANCE
*Note: All inquiries should reference the ID number above for prompt response.*

Total Patient Responsibility:    $0.00
Claim Payment:    $51.31

109.    In this example, GSL claimed $229 for the Covid Testing services it administered to the patient. Aetna asserted that $177.69 of this bill was not payable as explained in Remarks 1 and 2. Remark 1 refers to the "reasonable charge" Aetna thought this service warranted given the geographic area in which GSL provided it. Remark 2 vaguely references the "COVID-19 pandemic" as a catch-all justification for Aetna's not-payable determination. Aetna concludes that the patient responsibility is $0, and that it will pay GSL $51.31 on its $229 claim.

110.    If Aetna then charged the 50% "Access Fee" to Adobe, Inc.'s ASO Plan for the unilateral discount it applied to GSL, Aetna would pay itself $88.85 ($177.69 x 50%) for this work.

111.    This is egregious. Aetna has not only implemented schemes that undermine its obligations under the FFCRA, the CARES Act, and its public representations that it would comply with those obligations, but Aetna has found a way to convert assets from the Aetna ASO Plans, its own customers, to itself as a way "earning" additional profits at GSL's expense.

112.    This arrangement simultaneously disincentivizes Aetna from ever negotiating a rate agreement with GSL; without a negotiated rate, Aetna has every opportunity to short-change GSL and convert its Aetna ASO Plan assets to itself.

113.    Aetna's use of the mails and wires in furtherance of the Repricing Reduction Scheme has damaged GSL by diverting Aetna ASO Plans' trust assets away from GSL to allow

Aetna to pay itself "Access Fees" on the "savings" Aetna has achieved for the Aetna ASO Plans. Aetna's conduct has also forced GSL to incur unnecessary administrative costs in attempting to recover funds owed to GSL under the Aetna Health Plans, including the Aetna ASO Plans.

**5.  Sham Internal Administrative Appeals Scheme**

114.    Not only is Aetna violating the FFCRA and the CARES Act in its initial adjudication of Covid Testing claims, but when GSL appeals the adverse benefit determinations on behalf of Aetna Members, Aetna's internal administrative appeals process improperly disregards Aetna's obligation to ensure that all Aetna Health Plans subject to Section 6001 of the FFCRA, including the Aetna ASO Plans, comply with governing law and the terms of all private Aetna Health Plans.

115.    GSL has submitted thousands of appeals to Aetna through Aetna's internal administrative appeals process, but despite a legal duty to provide a thorough response that factors in a review and analysis of all applicable laws, Aetna both concealed material facts that were relevant to its adjudication of GSL's Covid Testing claims and ignored its obligations to comply with the FFCRA and CARES Act.

116.    Throughout the numerous appeals, Aetna did not reconsider a single Covid Testing claim. This, even though GSL's appeal letters informed Aetna of its obligations under the FFCRA and the CARES Act. Instead, Aetna routinely disregards GSL's arguments and upholds its initial determinations, refusing to cover GSL's Covid Testing claims or upholding reimbursement rates that are far below GSL's publicized cash price. These appeals are effectively rubber stamps that afford GSL no meaningful relief.

117.    The way in which Aetna administers its sham administrative appeals, described below, is all the worse considering that Aetna publicly proclaimed that it would comply with the FFCRA and the CARES Act.

118.    For all health plans subject to Section 6001 of the FFCRA, as amended, the Aetna Health Plans, including the Aetna ASO Plans, are obligated to comply with (i) the ACA's claims and appeals procedures prescribed in 45 CFR § 147.136, and (ii) for all private health plans also subject to ERISA, ERISA's claims and appeals procedures prescribed in 29 CFR § 2560.503-1.

119.    The ACA and ERISA require Aetna to maintain a benefit determination and claim appeal process that provides a full, meaningful, and independent review, and that affords plan beneficiaries and claimants broad rights to accurate, timely, and substantive information regarding the reasons, rules, methodologies, terms, provisions and interpretations that underlie benefit determinations.

120.    Yet Aetna's appeal responses fail to comply with even the most basic requirements established by the ACA and ERISA. Among other things, Aetna routinely:

- failed to provide the specific reason or reasons for their benefit determinations or review determinations;

- failed to make reference to the specific plan provisions on which their benefit determinations or review determinations were based;

- made materially false and misleading statements concerning their processing of claims, and refused to disclose the true internal rules, guidelines, protocols, and criteria relied upon in making the review;

- failed to provide GSL with a sufficient description of the underlying health plan's review procedures;

- failed to provide review of appeals that did not afford deference to the initial benefit determination, and which was conducted by an appropriate named fiduciary of the plan independent of the person who made the initial benefit determination; and

- denied GSL's efforts to become sufficiently acquainted with the terms of the underlying health plans, as well as the true methods used to reimburse GSL's claims, thereby rendering the administrative appeal a futile and meaningless endeavor.

121.    Below, a few representative examples of Aetna's appeal responses to GSL reveal Aetna's blatant disregard for the FFCRA and/or the CARES Act and/or its own internal policies. All appeal responses were sent from Aetna to GSL through the mails.

**COMPLAINT; DEMAND FOR JURY TRIAL**
*GS Labs, LLC v. Aetna, Inc., et al., Case No. 4:25-cv-08525,* United States District Court Northern District of California

122. **Example 1**:

> Dear Appellant:
>
> **Final level of appeal response – previous determination upheld**
> With this review, your request for payment of the claim(s) referenced above has reached the final level of appeal available through us. Based on our review of available information, including your appeal, we have made the following determination.
>
> We are upholding the original benefits determination for code 0202U. As a nonparticipating provider rendering services approved at the in-network level of benefits to our members, your payment amount is based on the reported services and the determination of a fair payment for the services provided. To determine the payment amount when a provider does not participate with Aetna and the plan does not define the applicable allowable amount, our responsibility is to pay a fair amount for your services.
>
> Our nonparticipating fee schedule was developed using the industry standard of the Centers for Medicare and Medicaid Services (CMS) Resources Based Relative Value Scale (RBRVS), plus a premium, to provide a fair level of reimbursement for nonparticipating providers and still protect our members and plan sponsors from incurring unpredictable medical expenses. We chose a RBRVS payment methodology because it is based on the resource costs (physician work, practice expense and professional liability insurance) required to perform each service. Based on this information, we will not modify our original decision and no additional payment is due.

123. In this response, Aetna makes no mention of the FFCRA, CARES Act, or its public promises to abide by those laws in processing GSL's Covid Testing claim. At a minimum, reference to those applicable laws is required under ERISA and the ACA's claims procedures. Aetna simply tells GSL that it will only pay the "fair amount" that it has unilaterally determined it owes GSL for its services.

124. **Example 2**:

> Dear Appellant:
>
> **Final level of appeal response – previous determination upheld**
> With this review, your request for payment of the claim(s) referenced above has reached the final level of appeal available through us. Based on our review of available information, including your request for appeal and claim, we have made the following determination.
>
> We are upholding the original benefits determination for services described as code(s) 87635 for date of services 09-03-2021. After further review, it has been determined that the member's plan provides benefits for covered expenses at a reasonable charge for the service in the geographical area where it is provided as determined by the plan or the applicable Medicare rate. You are not part of our network and therefore we cannot prevent you from billing the member for any balance. But if you do, we reserve the right to challenge your bill.

125. As with Example 1, Aetna again fails to provide a response that complies with even the basic requirements of ERISA and ACA claims procedures. Instead of responding to or even recognizing GSL's arguments that this claim was not reimbursed in accordance with Section 3202(a) of the CARES Act, Aetna merely notes that the claim amount it paid was "reasonable" given the geographic area in which the test was administered.

126. **Example 3**:

> Dear Appellant:
>
> **Final level of appeal response – previous determination upheld**
> With this review, your request for payment of the claim(s) referenced above has reached the final level of appeal available through us. Based on our review of available information, including appeal form and claim processing information, we have made the following determination.
>
> We are upholding the original benefits determination for the service(s) performed on January 31, 2022. You are an out-of-network provider and do not have a contracted rate from Aetna. The member's plan provides benefits for covered out-of-network services at what we find to be a recognized charge. The recognized charge determination on the claim resulted in a reduction in payment and was calculated by Data iSight. In the event you choose to balance bill the member for the amount reflected in the "not payable" column (in addition to the member's deductible that is reflected in the patient responsibility column), the member may be eligible for patient advocacy services through Data iSight to resolve the outstanding balance.

127. Again, Aetna fails to provide a response that complies with ERISA and ACA claims procedures. Further, instead responding to GSL's arguments that this claim was not reimbursed in accordance with Section 3202(a) of the CARES Act, Aetna reflexively upholds Data iSight's, a third-party Repricing Company, determination—presumably so that Aetna can keep the Aetna ASO Plan assets obtained through its Repricing Reduction Scheme.

128. The list of Aetna's deficient responses to GSL's appeals goes on and on. The responses make clear that Aetna's internal administrative appeals processes do not consider the applicable FFCRA or CARES Act requirements. This confirms Aetna's utter disregard of its obligations to, and own representations that it would, comply with these federal mandates.

129. Aetna's conduct has harmed GSL by wrongfully denying GSL reimbursement for services Aetna was required to pay. Aetna's conduct has also forced GSL to incur needless administrative costs in attempting to recover funds due and payable to GSL under the Aetna Health Plans, including the Aetna ASO Plans.

**6. Overpayment Recovery Scheme**

130. The Overpayment Recovery Scheme piggybacks on the Repricing Reduction Scheme; hence the facts and examples detailed in the Repricing Reduction Scheme are relevant here.

131. Through the Overpayment Recovery Scheme, Aetna conspires with Overpayment Recovery Companies to pay itself from embezzled and/or converted Aetna ASO Plan trust assets for recovering what Aetna calls "overpaid" amounts.

132. Aetna accomplishes this through the following means:

133.    Even when Aetna reimburses GSL in whole or in part for Covid Testing services, there is no guarantee that Aetna will allow GSL to keep those payments because Aetna often claims that it has "overpaid" the claim. Thus, not only does Aetna violate the FFCRA and the CARES Act on most of the Covid Testing claims GSL submits, but Aetna also shifts 100% of the risk of providing Covid Testing services to GSL by unilaterally declaring, sometimes years later, that Aetna overpaid GSL. Thus, the threat of improper recoupment is ever-present.

134.    Additionally, overpayment determinations constitute adverse benefit determinations; therefore, Aetna has an obligation to comply with the notice reasons described in the ERISA and ACA's claims procedure when issuing any overpayment notices to GSL. Yet Aetna has failed to do so. Not a single overpayment determination letter issued by Aetna or an Overpayment Recovery Company complies with the minimum requirements of the ERISA and ACA's claim procedures. Thus, GSL is not well-equipped to contest overpayment demands.

135.    The following are representative examples of the deficient overpayment notifications Aetna and its Overpayment Recovery Companies issue to GSL via mailed letters.

136.    **Example 1:** Aetna mailed GSL a refund demand on May 21, 2022, in the amount of $270.31 for the sole stated reason that "[t]he provider's discount arrangement was not calculated correctly on this claim."

137.    But GSL has no discount arrangement with Aetna. Aetna simply refused to pay GSL's cash price according to Aetna's legal obligations under the FFCRA and the CARES Act, and to add insult to injury, then clawed back money for itself from what little it did pay GSL.

138.    In this case, GSL had billed Aetna $810 for Covid Testing services rendered on December 31, 2020. Aetna unilaterally reduced that claim to an "Allowed Amount" of $363. Then, years later, on May 21, 2022, Aetna demanded that GSL return an additional $270.31, leaving GSL with less than $93 in payment on an $810 cash-price claim.

139.    **Example 2:** Payment Resolution Services ("PRS"), an Overpayment Recovery Company Payment for Aetna, demanded a refund from GSL on June 27, 2022, in the amount of $719.07 for the sole stated reason that "the expense was considered under an incorrect payment methodology[.]"

140.    GSL is left in the dark to guess why the payment methodology was incorrect. The only sure conclusion is that Aetna eschews its promises to comply with the FFCRA and the CARES Act, and then further uses an Overpayment Recovery Company to take additional profits for itself.

141.    There are hundreds of similar examples. The vast majority of Aetna Members' Covid Testing claims were paid using an arbitrary methodology and/or internal policy that does not align with the requirements of Section 3202(a) of the CARES Act. Then, sometimes years later, Aetna or a third-party Overpayment Recovery Company mails GSL a demand that GSL return the full or a substantial amount of the little payment GSL did receive for these claims.

142.    As a result of this Overpayment Recovery Scheme, GSL has not only been forced to repay amounts it was entitled to keep, but GSL faces the perpetual risk that Aetna will wrongfully claw back any payment it has made. Therefore, GSL has assumed all the risk of providing Covid Testing services. This conflicts with the FFCRA and the CARES Act. The overpayment determinations and attempted recovery of such "overpayments" constitute coverage violations of the FFCRA and reimbursement violations of the CARES Act which are incorporated into ERISA, the ACA, and the terms of each of the Aetna Health Plans, including the Aetna ASO Plans.

143.    As with the Repricing Reduction Scheme, Aetna has a financial incentive through this scheme to manufacture or concoct fraudulent reasons to recover purported overpayments because Aetna and any Overpayment Recovery Company conspiring with Aetna to collect "overpaid" amounts can pay themselves a bounty from the Aetna ASO Plan assets.

144.    Through its ASO Agreements, Aetna establishes that "**Overpayment recoveries made through third party recovery vendors, collection agencies, or attorneys are credited to Customer net of reasonable fees charged by Aetna or those entities.**" (emphasis in original). That is, Aetna gives the Aetna ASO Plans some of the "overpayment" back—an "overpayment" Aetna made in the first place—but only after taking a "reasonable fee" off the top for itself.

145.    Further, Aetna's ASO agreements prohibit the Aetna ASO Plans from attempting to collect any overpayments themselves.

146.    These schemes allow Aetna to extract improper bounties twice on a single claim. First, Aetna can take an "Access Fee" by unilaterally discounting GSL's Covid Testing claims—in

violation of the FFCRA, the CARES Act, and Aetna's own promises—and second, Aetna can then vaguely and deficiently assert that it overpaid GSL's discounted claim, taking for itself a "reasonable fee" from the recovered Aetna ASO Plan's "overpayment."

147.    Aetna's use of the mails and wires in furtherance of the Overpayment Recovery Scheme has damaged GSL by diverting Aetna ASO Plan trust assets away from GSL to allow Aetna to pay itself and its contracted Overpayment Recovery Companies recovery fees on the purported "overpayments" Aetna has made and clawed back from GSL. Aetna's conduct has also forced GSL to incur needless administrative costs in attempting to stop the recovery of funds owed and already paid to GSL under the Aetna Health Plans, including the Aetna ASO Plans.

**E.    Aetna Embezzles and Converts Funds from Aetna ASO Plans, in Violation of 18 U.S.C. § 664.**

148.    Aetna wrongfully profits by (i) improperly retaining and/or recovering—and effectively embezzling and/or converting—Aetna ASO Plans' trust assets that are due and owing to GSL under the terms of the Aetna ASO Plans as required by the FFCRA and the CARES Act; (ii) earning interest on these amounts; and (iii) embezzling and/or converting Aetna ASO Plan trust assets into savings and recovery fees calculated as a percentage of savings or recoveries manufactured under the Repricing Reduction Scheme, the Overpayment Recovery Scheme, and the other various and related schemes.

149.    Through this conduct, Aetna has engaged in multiple acts of embezzlement and/or conversion of the Aetna ASO Plan trust assets in violation of 18 U.S.C. § 664.

150.    Aetna's conduct directly harms GSL by improperly diverting to itself Aetna ASO Plans' trust assets—assets that are due and payable to GSL for its Covid Testing services, and by forcing GSL to incur unnecessary administrative costs in attempting to recover funds due and payable to GSL under the Aetna ASO Plans.

**F.    The Impact of Aetna's Conduct**

151.    Aetna falsely and deceptively marketed to California residents and providers like GSL that it would comply with the FFCRA and the CARES Act. Even more, Aetna has gone to

1    lengths to circumvent its obligations under federal law, engaging with co-conspirators and using

2    the Aetna ASO Plans to enrich itself through several fraudulent schemes.

3         152.    Aetna publicly feigns compliance with the FFCRA and the CARES Act as cover

4    for: (i) pushing internal policies and agendas that directly contradict the FFCRA, the CARES Act,

5    and its own public representations; (ii) overwhelming and inundating GSL and other OON

6    providers with inconsistent, conflicting, and contradictory adjustment/reason codes, appeal

7    responses, and overpayment reasons that GSL is forced to address on a claim-by-claim basis,

8    thereby subjecting GSL to a paperwork war of attrition that Aetna knows the vast majority of OON

9    providers cannot withstand; (iii) administering a sham internal review process that does not even

10   consider applicable federal and state laws and/or the terms of the Aetna Health Plans that should

11   supersede Aetna's own internal policies; and (iv) ultimately, allowing Aetna to execute the

12   Repricing Reduction Scheme and the Overpayment Recovery Scheme to embezzle and/or convert

13   Aetna ASO plan trust assets through the fraudulent manufacturing of "Access" and "recovery" fees.

14        153.    Aetna's acts in furtherance of its schemes to defraud in violation of 18 U.S.C.

15   §§ 1341 and 1343, and its acts of embezzlement and/or wrongful conversion of the Aetna ASO

16   Plan trust assets in violation of 18 U.S.C. § 664, represent a pattern of racketeering activity within

17   the meaning of 18 U.S.C. § 1961(5).

18        154.    Aetna's fraudulent schemes and embezzlement and/or conversion have caused GSL

19   to suffer significant financial harm. In addition to the pecuniary losses described above, GSL has

20   incurred millions of dollars in time, labor, and other administrative expenses communicating with

21   Aetna, the Repricing Companies, and the Overpayment Recovery Companies both through written

22   and oral means, in attempts to recover proper reimbursements on claims submitted by GSL for the

23   medically appropriate Covid Testing services provided to Aetna Members.

24

25

26

27

28

**COMPLAINT; DEMAND FOR JURY TRIAL**

*GS Labs, LLC v. Aetna, Inc., et al.*, *Case No. 4:25-cv-08525*, United States District Court Northern District of California

# CAUSES OF ACTION

## COUNT I

### VIOLATION OF 18 U.S.C. § 1962(c)

#### (*Against Aetna*)

155.    GSL re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–154 as if fully set forth herein.

156.    GSL is a "person" within the meaning of 18 U.S.C. § 1961(3).

157.    Aetna is a "person" within the meaning of 18 U.S.C. § 1961(3).

158.    Each of the Aetna ASO Plans is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The Aetna ASO Plans were engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

159.    Aetna is associated with the Aetna ASO Plans, exercises control over the Aetna ASO Plans as their administrator, and has conducted or participated, directly or indirectly, in the conduct of the Aetna ASO Plans in relation to GSL through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5).

160.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5), described more fully above, includes Aetna's multiple, repeated, and continuous uses of the mails and wires in furtherance of distinct but interrelated schemes to defraud, in violation of 18 U.S.C. §§ 1341 and 1343. It also includes Aetna's multiple, repeated, and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the Aetna ASO Plans subject to ERISA, in violation of 18 U.S.C. § 664.

161.    Aetna has also used the wires and mails in furtherance of its schemes to defraud by, among other things, disseminating false and misleading information over the wires (for example, by electronic transmission to GSL through HIPAA standard transactions for claims submission and processing and through electronic fund transfers), and by mail.

162.    Through these schemes, discussed more fully above, Aetna communicates with Aetna ASO Plans, through ASO agreements negotiated through the wires and/or mails, and through its communications in the processing of electronic health care transactions, falsely stating that the

28

**COMPLAINT; DEMAND FOR JURY TRIAL**
*GS Labs, LLC v. Aetna, Inc., et al., Case No. 4:25-cv-08525,* United States District Court Northern District of California

claims denied or the amounts underpaid to GSL are justified and accurate under the terms of the Aetna ASO Plans or applicable law.

163.    Aetna has engaged in these racketeering activities with the specific intent to defraud, as described in this Complaint, for the purposes of depriving GSL and the Aetna ASO Plans of money and other property.

164.    Aetna has also embezzled or converted Aetna ASO Plan trust assets by, among other things, retaining, earning interest on and earning administrative fees as a percentage of, fraudulently retained or recovered Aetna ASO Plan trust assets that are owed to GSL under the terms of the Aetna ASO Plans.

165.    As a direct result of Aetna's violation of 18 U.S.C. § 1962(c), GSL has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from Aetna's intentional circumvention of the FFCRA and the CARES Act; (ii) lost revenue from Aetna's intentional underpayment and denial of claims submitted for reimbursement for Covid Testing of Aetna Members; (iii) lost revenue from Aetna's intentional diversion of Aetna ASO Plan trust assets that are otherwise due and payable to GSL; and (iv) the costs in time, labor, and other administrative expense incurred because of Aetna's unlawful conduct.

## COUNT II

## VIOLATION OF 18 U.S.C. § 1962(d)

## BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)

### (*Against Aetna*)

166.    GSL re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–154 as if fully set forth herein.

167.    GSL is a "person" within the meaning of 18 U.S.C. § 1961(3).

168.    Aetna is a "person" within the meaning of 18 U.S.C. § 1961(3).

169.    Each of the Aetna ASO Plans is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The Aetna ASO Plans were engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

170.    Aetna has conspired with one or more non-party Repricing Companies and/or Overpayment Recovery Companies, within the meaning of 18 U.S.C. § 1962(d), to violate the provisions of 18 U.S.C. § 1962(c).

171.    Specifically, Aetna and one or more of the non-party Repricing Companies and/or the Overpayment Recovery Companies each agreed and intended, or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the Aetna ASO Plans through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

172.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5), described more fully above, includes Aetna's multiple, repeated, and continuous uses of the mails and wires in furtherance of distinct but interrelated schemes to defraud, in violation of 18 U.S.C. §§ 1341 and 1343. It also includes Aetna's multiple, repeated, and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the Aetna ASO Plans subject to ERISA, in violation of 18 U.S.C. § 664.

173.    As described more fully above, Aetna has conspired with one or more of the non-party Repricing Companies and/or the Overpayment Recovery Companies to engage in these racketeering activities with the specific intent to defraud, described more fully throughout this Complaint.

174.    Aetna and the non-party Repricing Companies and/or the Overpayment Recovery Companies have conspired to commit these activities in furtherance of Aetna's schemes to defraud and for the purpose of depriving GSL and the Aetna ASO Plans of money and other property. Aetna has embezzled or converted Aetna ASO Plan trust assets by among other things, retaining, earning interest on and earning administrative fees as a percentage of (net a percentage of savings paid and/or recoveries made to non-party Repricing Companies and/or the Overpayment Repricing Companies), fraudulently retained and/or withheld Aetna ASO Plan trust assets that are owed to GSL for services rendered to Aetna Members of each of the respective Aetna ASO Plans.

175.    Aetna has also used the wires and mails in furtherance of its schemes to defraud by, among other things, disseminating false and misleading information over the wires (for example,

30

**COMPLAINT; DEMAND FOR JURY TRIAL**

*GS Labs, LLC v. Aetna, Inc., et al., Case No. 4:25-cv-08525,* United States District Court Northern District of California

by electronic transmission to GSL through HIPAA standard transactions for Covid Testing claims submission and processing and through electronic fund transfers), and by mail.

176.    Aetna's activities described herein in furtherance of its conspiracy to violate 18 U.S.C. § 1962(c) separately violate 18 U.S.C. § 1962(d). Aetna's violations of 18 U.S.C. § 1962(d) have likewise obstructed, delayed, or otherwise affected interstate commerce.

177.    As a direct result of Aetna's unlawful conspiracy, under 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c), and its unlawful acts of racketeering undertaken in furtherance of the conspiracy, described herein, GSL has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from Aetna's intentional circumvention of the FFCRA and the CARES Act; (ii) lost revenue from Aetna's intentional underpayment and denial of claims submitted for reimbursement for Covid Testing of Aetna Members (iii) lost revenue from Aetna's intentional diversion of Aetna ASO Plan trust assets that are otherwise due and payable to GSL; and (iv) the costs in time, labor, and other administrative expense incurred because of Aetna's unlawful conduct.

## COUNT III

## VIOLATION OF 18 U.S.C. § 1962(a)

### (*Against Aetna*)

178.    GSL re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–154 as if fully set forth herein.

179.    GSL is a "person" within the meaning of 18 U.S.C. § 1961(3).

180.    Aetna is a "person" within the meaning of 18 U.S.C. § 1961(3).

181.    Aetna, the Repricing Companies, and the Overpayment Recovery Companies are "enterprises" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a). Aetna, the Repricing Companies, and the Overpayment Recovery Companies were engaged in activities affecting interstate and foreign commerce at all times relevant to this Original Complaint.

182.    Aetna has directly and indirectly invested and used the proceeds of its pattern of racketeering activity in the establishment or operation of itself, the Repricing Companies, and the Overpayment Recovery Companies, in violation of 18 U.S.C. § 1962(a).

183.    The pattern of racketeering activity, the proceeds of which were invested in the establishment or operation of these enterprises, includes Aetna's multiple, repeated, and continuous uses of the mails and wires in furtherance of the various but interrelated schemes detailed above, in violation of 18 U.S.C. §§ 1341 and 1343, described more fully above. It also includes Aetna's multiple, repeated, and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the Aetna ASO Plan trust assets for those Aetna ASO Plans subject to ERISA, described more fully above, in violation of 18 U.S.C. § 664.

184.    Aetna's activities described herein in violation of 18 U.S.C. § 1962(a) have obstructed, delayed, or otherwise affected interstate commerce.

185.    Aetna's investment and use of the proceeds of its pattern of racketeering activity in the establishment or operation of itself, the Repricing Companies, and the Overpayment Recovery Companies, in violation 18 U.S.C. § 1962(a), has directly injured GSL. This injury includes diversion of Aetna ASO Plan trust assets otherwise due and payable to GSL away from GSL and into Aetna, its Repricing Companies, and its Overpayment Recovery Companies.

186.    Specifically, as detailed more fully above, Aetna manufactures and retains "savings" and "recovery" fees from the Aetna ASO Plans through their misrepresentations and embezzlement and/or conversion of Aetna ASO Plan trust assets. Aetna then invests these "savings" and "recovery" fees into itself and their contracted Repricing Companies and Overpayment Recovery Companies. Doing so directly harms GSL by obstructing GSL's access to the Aetna ASO Plan trust assets to which GSL is lawfully entitled.

187.    As a direct result of Aetna's violation of 18 U.S.C. § 1962(a), to violate 18 U.S.C. § 1962(c), GSL has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from Aetna's intentional circumvention of the FFCRA and the CARES Act; (ii) lost revenue from Aetna's intentional underpayment and denial of claims submitted for reimbursement for Covid Testing of Aetna Members (iii) lost revenue from Aetna's intentional diversion of Aetna ASO Plan trust assets that are otherwise due and payable to GSL; and (iv) the costs in time, labor, and other administrative expense incurred because of Aetna's unlawful conduct.

32

**COMPLAINT; DEMAND FOR JURY TRIAL**
*GS Labs, LLC v. Aetna, Inc., et al., Case No. 4:25-cv-08525, United States District Court Northern District of California*

# COUNT IV

## VIOLATION OF 18 U.S.C. § 1962(d)

## BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(a)

### (*Against Aetna*)

188. GSL re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–154 as if fully set forth herein.

189. GSL is a "person" within the meaning of 18 U.S.C. § 1961(3).

190. Aetna is a "person" within the meaning of 18 U.S.C. § 1961(3).

191. Aetna, the Repricing Companies, and the Overpayment Recovery Companies are "enterprises" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a). Aetna, the Repricing Companies, and the Overpayment Recovery Companies were engaged in activities affecting interstate and foreign commerce at all times relevant to this Original Complaint.

192. Aetna has conspired with one or more non-party Repricing Companies and Overpayment Recovery Companies, within the meaning of 18 U.S.C. § 1962(d) to violate the provisions of 18 U.S.C. § 1962(a).

193. Specifically, Aetna and one or more of the non-party Repricing Companies and/or Overpayment Recovery Companies each agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: directly or indirectly investing the proceeds of Aetna's pattern of racketeering activity in the establishment or operation of Aetna, the Repricing Companies, and the Overpayment Recovery Companies, in violation of 18 U.S.C. § 1962(a).

194. The pattern of racketeering activity, the proceeds of which were intended to be invested in the establishment or operation of these enterprises, includes Aetna's multiple, repeated, and continuous uses of the mails and wires in furtherance of the various but interrelated schemes detailed above, in violation of 18 U.S.C. §§ 1341 and 1343, described more fully above. It also includes Aetna's multiple, repeated, and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the Aetna ASO Plan trust assets for those Aetna ASO Plans subject to ERISA, described more fully above, in violation of 18 U.S.C. § 664.

33

**COMPLAINT; DEMAND FOR JURY TRIAL**
*GS Labs, LLC v. Aetna, Inc., et al., Case No. 4:25-cv-08525,* United States District Court Northern District of California

195.    Aetna's activities described herein in furtherance of its conspiracy to violate 18 U.S.C. § 1962(a) have obstructed, delayed, or otherwise affected interstate commerce.

196.    Aetna's conspiracy to invest and use the proceeds of its pattern of racketeering activity in the establishment or operation of itself, the Repricing Companies, and the Overpayment Recovery Companies, in violation 18 U.S.C. § 1962(a), has directly injured GSL. This injury includes diversion of Aetna ASO Plan trust assets otherwise due and payable to GSL away from GSL and into Aetna, its Repricing Companies, and its Overpayment Recovery Companies. Aetna is also able to invest and use the funds so diverted to maintain a robust network of Repricing Companies and Overpayment Recovery Companies and others through which Aetna can continue to inflict harm on GSL, as described more fully above.

197.    As a direct result of Aetna's unlawful conspiracy, under 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(a), and its unlawful acts of racketeering undertaken in furtherance of the conspiracy, described herein, GSL has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from Aetna's intentional circumvention of the FFCRA and the CARES Act; (ii) lost revenue from Aetna's intentional underpayment and denial of claims submitted for reimbursement for Covid Testing of Aetna Members (iii) lost revenue from Aetna's intentional diversion of Aetna ASO Plan trust assets that are otherwise due and payable to GSL; and (iv) the costs in time, labor, and other administrative expense incurred because of Aetna's unlawful conduct.

## COUNT V

## VIOLATIONS OF CAL. BUS. & PROF. CODE § 17500, ET SEQ.

### (*Against Aetna*)

198.    GSL re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–154 as if fully set forth herein.

199.    Aetna violated California's False Advertising Law ("FAL") when, as alleged in greater detail in the preceding paragraphs, Aetna falsely advertised and marketed to GSL and California residents that it would comply with the requirements of the FFCRA and the CARES Act in its Covid Testing coverage policies, which was unfair, deceptive, untrue, and misleading.

34

**COMPLAINT; DEMAND FOR JURY TRIAL**
*GS Labs, LLC v. Aetna, Inc., et al., Case No. 4:25-cv-08525,* United States District Court Northern District of California

200.    These representations were false because Aetna never intended to pay the cash price or negotiate an agreed rate with OON providers like GSL.

201.    This conduct was designed to—and did—deceive GSL and California residents as to Aetna's true coverage practices for Covid Testing services.

202.    Aetna knew or should have known through the exercise of reasonable care that their representations about their coverage of Covid Testing services were untrue and misleading and likely to deceive GSL and California residents.

203.    Aetna's misrepresentations were material because GSL reasonably relied upon them in providing Covid Testing services to hundreds of California residents who were members of an Aetna Health Plan.

204.    GSL justifiably relied upon these material representations by agreeing to render Covid Testing services to Aetna members and billing Covid Testing claims to Aetna on behalf these members with the expectation that Aetna would cover and not deny and/or underpay the thousands of Covid Testing claims that it has. Also, in the instances Covid Testing Services were covered, GSL relied on Aetna's representations that GSL would be reimbursed in accordance with Section 3202(a) of the CARES Act.

205.    GSL has suffered injuries in fact and has lost money as a direct and proximate result of Aetna's misconduct in violation of the FAL including, but not limited to, lost revenue from Aetna's misrepresentations about its compliance with the FFCRA and the CARES Act, lost revenue from Aetna's intentional underpayment and denial of claims submitted for reimbursement for Covid Testing of Aetna Members, and the costs in time, labor, and other administrative expense incurred because of Aetna's unlawful conduct.

206.    At a minimum, to the extent the Court deems inadequate the remedies at law that GSL requests, GSL is entitled to equitable relief such as restitution and injunctive relief under Cal. Bus. and Prof. Code § 17535.

## COUNT VI

## VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200, ET SEQ.

### (*Against Aetna*)

207.   GSL re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–154 as if fully set forth herein.

208.   Aetna committed acts of unfair competition, as described above, in violation of California's Unfair Competition Law ("UCL").

209.   Aetna's conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, violations of Section 6001 of the FFCRA, Section 3202(a) of the CARES Act, RICO (18 U.S.C. §§ 1962(a), (b), and (d)), the ACA (45 CFR § 147.136), and California's FAL (Cal. Bus. & Prof. Code § 17500, et seq.) as described in the preceding paragraphs.

210.   Aetna's conduct separately constitutes "unfair" business practices within the meaning of the UCL because, as described in the preceding paragraphs, Aetna's practice of misrepresenting its intentions to comply with the FFCRA and the CARES Act in its Covid Testing coverage policies are unscrupulous and substantially injurious to GSL and California consumers at large, are not outweighed by any utility from the practices, and were not reasonably avoidable by GSL or California residents. Any purported benefits arising from Aetna's conduct do not outweigh the harms caused to GSL and the public.

211.   Aetna's conduct also constitutes a "fraudulent" business practice in violation of the UCL because, as described in the preceding paragraphs, Aetna's misrepresentations about its intentions to comply with the FFCRA and the CARES Act in its policies for covering Covid Testing services was designed to—and did—deceive GSL and California residents as to Aetna's true coverage practices for Covid Testing services.

212.   Aetna knew or should have known that their conduct constituted unlawful, unfair, and fraudulent business practices that were likely to deceive GSL and California residents.

213.   GSL justifiably relied upon Aetna's material representations by agreeing to render Covid Testing services to Aetna members and billing Covid Testing claims to Aetna on behalf these

36

**COMPLAINT; DEMAND FOR JURY TRIAL**

*GS Labs, LLC v. Aetna, Inc., et al., Case No. 4:25-cv-08525,* United States District Court Northern District of California

members with the expectation that Aetna would cover and not deny and/or underpay the thousands of Covid Testing claims that it has. Also, in the instances Covid Testing Services were covered, GSL relied on Aetna's representations that GSL would be reimbursed in accordance with Section 3202(a) of the CARES Act.

214.    GSL has suffered injuries in fact and has lost money as a direct and proximate result of Aetna's UCL violations including, but not limited to, lost revenue from Aetna's misrepresentations about its compliance with the FFCRA and the CARES Act, lost revenue from Aetna's intentional underpayment and denial of claims submitted for reimbursement for Covid Testing of Aetna Members, and the costs in time, labor, and other administrative expense incurred because of Aetna's unlawful conduct.

215.    At a minimum, to the extent the Court deems inadequate the remedies at law that GSL requests, GSL is entitled to equitable relief such as restitution and injunctive relief under Cal. Bus. and Prof. Code § 17203 enjoining Aetna from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices.

## COUNT VII

## FRAUD and NEGLIGENT MISREPRESENTATION

### (*Against Aetna*)

216.    GSL re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–154 as if fully set forth herein.

217.    Aetna represented to GSL that Aetna would comply with the FFCRA and the CARES Act, pay for the costs of COVID-testing services for its members from providers like GSL, and that any conflicting Aetna policy or guideline was superseded by Aetna's compliance with the FFCRA and CARES Act. Aetna made these representations through publicly issued guidelines and policies to providers like GSL.

218.    Aetna's representations that it would comply with the FFCRA and the CARES Act, pay for the costs of COVID-testing services for its members from providers like GSL, and that any conflicting Aetna policy or guideline was superseded by Aetna's compliance with the FFCRA and CARES Act were false and misleading and did not communicate Aetna's actual practice methods for adjudicating these claims.

219.    Aetna instead denied claims, arbitrarily adjudicated claims, and refused to issue proper reimbursements for claims GSL submitted on behalf of the members of health plans Aetna insured and administered.

220.    Aetna knowingly or negligently made false representations to GSL in order to: (i) circumvent its obligations to comply with the FFCRA and the CARES Act; (ii) further the various and interrelated schemes detailed above; and (iii) allow it to recover "savings" and "recovery" fees through the Repricing Reduction Scheme and the Overpayment Reduction Scheme.

221.    Aetna issues these representations to out-of-network providers like GSL with the intention that the providers act on them in furtherance of Aetna's various and interrelated schemes.

222.    GSL justifiably relied upon these material representations by agreeing to render Covid Testing services to Aetna members and billing Covid Testing claims to Aetna on behalf these members with the expectation that Aetna would cover and not deny and/or underpay the thousands of Covid Testing claims that it has. Also, in the instances Covid Testing Services were covered, GSL relied on Aetna's representations that GSL would be reimbursed in accordance with Section 3202(a) of the CARES Act.

223.    Moreover, Aetna intentionally concealed material facts abouts it claims processing procedures from GSL despite having a duty to disclose such facts to GSL, even after GSL's numerous inquiries and requests for details regarding Aetna's conduct and its disregard for the FFCRA, the CARES Act, and Aetna's own representations.

224.    GSL's justified reliance on Aetna's misrepresentations caused it to suffer a definite and substantial detriment and has caused it damages including, but not limited to: (i) lost revenue from Aetna's intentional circumvention of the FFCRA and the CARES Act; (ii) lost revenue from Aetna's intentional underpayment and denial of claims submitted for reimbursement for Covid Testing of Aetna Members; (iii) lost revenue from Aetna's intentional diversion of Aetna ASO Plan trust assets that are otherwise due and payable to GSL; and (iv) the costs in time, labor, and other administrative expense incurred because of Aetna's unlawful conduct.

225.    Based on the above, GSL is entitled to punitive damages, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT VIII

## FRAUD and NEGLIGENT MISREPRESENTATION BY AGENT

### (*Against Aetna ASO Plans*)

226.    GSL re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–154 as if fully set forth herein.

227.    There is a principal-agency relationship between the Aetna ASO Plans and Aetna as the plans' third-party claims administrator. Employers who offer healthcare coverage through a self-funded health plan designate a person or entity in their plan document and or their IRS Form 5500s as the plan administrator. A plan administrator establishes and/or maintains the group health plan and provides medical coverage for participants and/or their dependents directly or through ways such as insurance and reimbursement.

228.    A plan administrator's responsibility is to handle the administrative tasks that accompany providing insurance coverage such as: (i) establishing and designing group health plans and plan benefits; (ii) enrolling employees and covered dependents into the health plan; (iii) coordinating with healthcare providers; (iv) issuing plan documents and ID cards; and (v) collecting premium payments/contributions from those employees that have enrolled themselves and/or their covered dependents into health plan. A plan administrator is responsible for providing the aforementioned services and fulfilling these obligations to enrolled health plan members. Here, the Aetna ASO Plans are responsible for providing these services and fulfilling these obligations to their members whose Covid Testing claims are at issue in this lawsuit.

229.    Because the responsibilities required of a plan administrator are usually beyond a plan administrator's expertise, many plan administrators contract with third-party claims administrators, like Aetna, and designate them to perform these services on their behalf. Third-party claims administrators provide, among other things, administrative services for self-funded health plans as well as allow enrollees in the health plans access to their healthcare networks and contracted rates.

230.    The Aetna ASO Plans engaged Aetna as their third-party claims administrator and agent, to provide administrative services on behalf of their members and beneficiaries.

231.    A typical Aetna master services agreement with a self-funded health plan like the Aetna ASO Plans states the plan responsibilities delegated to Aetna by the plan administrator. The agreement details the services to be offered, the timeframe in which they will be offered, and the standard of care to be exercised as well as other details. Aetna agrees to the handling of these services by performing the responsibility of a claims administrator of the plan administrator, such as issuing plan documents and ID cards and processing/adjudicating claims.

232.    Typically, the customer (in this case the Aetna ASO Plans) retains complete authority and responsibility for its plan, its operation, and the benefits provided thereunder. In other words, the Aetna ASO Plans are ultimately responsible for the acts or omissions of Aetna as they relate to administration of their health plan.

233.    As an authorized agent for the Aetna ASO Plans, Aetna, (i) intentionally or negligently misrepresented to providers, like GSL, and Aetna members, that its adjudications methods for Covid Testing Claims complied with the FFCRA and the CARES Act; and (ii) engaged in fraudulent conduct to continuously misinform GSL of Aetna's obligations to comply with the FFCRA and CARES Act; and (iii) withheld material information that Aetna had a duty to disclose. The Aetna ASO Plans are liable for their agent Aetna's fraudulent representations and actions to GSL.

234.    The Aetna ASO Plans knew or should have known of the falsity of Aetna's representations to providers like GSL that Aetna complies with the FFCRA and CARES act in adjudicating Covid Testing Claims, and that providers like GSL would rely on such representations in deciding whether to perform services for their members and beneficiaries.

235.    GSL has suffered substantial damages as a result of Aetna's fraud, for which the Aetna ASO Plans are ultimately responsible.

## COUNT IX

## PROMISSORY ESTOPPEL

### (*Against Aetna*)

236.    GSL re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–154 as if fully set forth herein.

237.    Aetna conveyed to GSL that Aetna would comply with the FFCRA and the CARES Act, pay for the costs of COVID-testing services for its members from providers like GSL, and that any conflicting Aetna policy or guideline was superseded by Aetna's compliance with the FFCRA and CARES Act and promise to pay for COVID-testing services.

238.    Aetna instead denied claims, arbitrarily adjudicated claims, and refused to issue proper reimbursements for claims GSL submitted on behalf of the members of health plans Aetna insured and administered.

239.    Aetna expected, or reasonably should have expected, that GSL would rely on Aetna's promises that it would comply with the FFCRA and the CARES Act, pay for the costs of COVID-testing services for its members from providers like GSL, and that any conflicting Aetna policy or guideline was superseded by Aetna's compliance with the FFCRA and CARES Act.

240.    GSL justifiably relied upon Aetna's material representations by agreeing to render Covid Testing services to Aetna members and billing Covid Testing claims to Aetna on behalf these members with the expectation that Aetna would cover and not deny and/or underpay the thousands of Covid Testing claims that it has. Also, in the instances Covid Testing Services were covered, GSL relied on Aetna's representations that GSL would be reimbursed in accordance with Section 3202(a) of the CARES Act.

241.    GLS's reliance on Aetna's promises caused it to suffer a definite and substantial detriment and has caused it damages including, but not limited to, lost revenue from Aetna's misrepresentations that it would comply with the FFCRA and the CARES Act, lost revenue from Aetna's intentional underpayment and denial of claims submitted for reimbursement for Covid Testing of Aetna Members, and the costs in time, labor, and other administrative expense incurred because of Aetna's unlawful conduct.

242.    GSL is thus entitled to compensatory damages, interest, costs of suit, attorneys' fees, and other such relief as the Court deems equitable and just.

## **PRAYER FOR RELIEF**

GSL seeks a judgment in its favor against Defendants as follows:

a.  Awarding injunctive and declaratory relief to prevent Defendants' continuing actions detailed above which are unauthorized and prohibited by the Aetna Health Plans, including the Aetna ASO Plans, and applicable law;

b.  Compensatory and consequential damages resulting from injury to GSL's business and property by reason of Defendants' violations of 18 U.S.C. § 1962, as set forth above and to be further established at trial, subject to trebling under 18 U.S.C. § 1964(c);

c.  Treble and exemplary damages due to Defendants' RICO violations and fraud.

d.  Appointing an independent fiduciary at Aetna's expense to re-adjudicate all of GSL's Covid Testing claims initially processed by Aetna, and to reimburse GSL all amounts Aetna and the Aetna ASO Plans were required to reimburse GSL pursuant to the FFCRA, the CARES Act, the ACA, and the terms of the Aetna Health Plans;

e.  Ordering Defendants to pay all reasonable costs and expenses of the independent fiduciary in re-adjudicating the Covid Testing claims and the reasonable costs and expenses associated with correcting all improperly adjudicated Covid Testing claims;

f.  Awarding lost profits and compensatory damages in such amounts as the proofs at trial shall show;

g.  Awarding restitution for payments improperly withheld by Defendants;

h.  Awarding reasonable attorneys' fees, as provided by common law, federal or state statute, or equity, including 18 U.S.C. § 1964(c);

i.  Awarding costs of suit;

j.  Awarding pre-judgment and post-judgment interest as provided by common law, federal or state statute or rule, or equity; and

k.  Awarding all other relief to which GSL is entitled.

**COMPLAINT; DEMAND FOR JURY TRIAL**
*GS Labs, LLC v. Aetna, Inc., et al., Case No. 4:25-cv-08525,* United States District Court Northern District of California

1   Date: October 6, 2025                    Respectfully submitted,

2

3                                            *s/ Luke I. Landers*
                                             Michael Merriman
4                                            Luke I. Landers
                                             HILGERS GRABEN PLLC
5                                            655 West Broadway, Suite 900
                                             San Diego, CA 92101
6                                            Telephone:  619.369.6232
                                             Email: mmerriman@hilgersgraben.com
7                                                    llanders@hilgersgraben.com

8                                            Alec Schultz, *pro hac vice pending*
                                             HILGERS GRABEN PLLC
9                                            1221 Brickell Avenue, Suite 900
                                             Miami, FL 33131
10                                           Telephone: 305.630.8304
                                             Email:  aschultz@hilgersgraben.com

11                                           Hadyn Pettersen, *pro hac vice pending*
                                             HILGERS GRABEN PLLC
12                                           601 Pennsylvania Ave NW, Suite 900
                                             Washington, DC 20004
13                                           Telephone: 313.572.7255
                                             Email:  hpettersen@hilgersgraben.com

14

15                                           *Counsel for Plaintiff GS LABS, LLC*

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT; DEMAND FOR JURY TRIAL**
*GS Labs, LLC v. Aetna, Inc., et al., Case No. 4:25-cv-08525,* United States District Court Northern District of California

1

## DEMAND FOR JURY TRIAL

2    Plaintiff respectfully demands a trial by jury on all issues that can be tried to a jury.

3    Date: October 6, 2025                                        Respectfully submitted,

4

5                                                *s/ Luke I. Landers*
                                                 Michael Merriman
                                                 Luke I. Landers
6                                                HILGERS GRABEN PLLC
                                                 655 West Broadway, Suite 900
7                                                San Diego, CA 92101
                                                 Telephone:  619.369.6232
8                                                Email: mmerriman@hilgersgraben.com
                                                        llanders@hilgersgraben.com
9
                                                 Alec Schultz, *pro hac vice pending*
10                                               HILGERS GRABEN PLLC
                                                 1221 Brickell Avenue, Suite 900
11                                               Miami, FL 33131
                                                 Telephone: 305.630.8304
12                                               Email:  aschultz@hilgersgraben.com

13                                               Hadyn Pettersen, *pro hac vice pending*
                                                 HILGERS GRABEN PLLC
14                                               601 Pennsylvania Ave NW, Suite 900
                                                 Washington, DC 20004
15                                               Telephone: 313.572.7255
                                                 Email:  hpettersen@hilgersgraben.com
16

17                                               *Counsel for Plaintiff GS LABS, LLC*

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT; DEMAND FOR JURY TRIAL**
*GS Labs, LLC v. Aetna, Inc., et al., Case No. 4:25-cv-08525,* United States District Court Northern District of California